JEFFREY AND SHARON BOSS, THE WEINSTEINS, THE YOKOIS, THE SULLIVANS, THE KALLITS, THE QUESTERS, THE GUILIANOS, THE PEDRETTIS, THE RIPPES, THE BANKOFFS AND THE ALESSIOS, PLAINTIFFS–RESPONDENTS, v. ROCKLAND ELECTRIC COMPANY, DEFENDANT–APPELLANT, AND PUBLIC SERVICE ELECTRIC AND GAS CO., AND TENNESSEE GAS AND TRANSMISSION CO., DEFENDANTS.

Argued September 27, 1983—Decided December 22, 1983.

Howard T. Rosen argued the cause for appellant (*Rosen, Gelman & Weiss*, attorneys; *Howard T. Rosen*, of counsel; *James H. Laskey*, on the brief).

*Kevin G. Roe* argued the cause for respondents (*Lucianna, Bierman & Stillman*, attorneys).

*Carla Vivian Bello*, Deputy Attorney General, argued the cause for *amicus curiae* Board of Public Utilities (*Irwin I.*

*Kimmelman,* Attorney General of New Jersey, attorney; *Andrea Silkowitz,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the relationship between a court and an administrative agency in determining the legal rights of parties when resolution of a dispute depends in part upon determination of factual issues that have been placed within the special competence of the administrative body. We hold that the proper procedure in this case is for the court to refer the factual issues to the agency for its findings. We reverse the judgment below that determined the parties' rights under an electric utility easement without reference to the Board of Public Utility Commissioners.

Defendant utility, Rockland Electric Company (Rockland), is a wholly-owned subsidiary of Orange and Rockland Electric Company, a New York corporation. The parent corporation operates 380 miles of transmission lines of which about 82 miles are in New Jersey and maintained by Rockland.

This case concerns a 6 to 8 mile loop of transmission line in northwest Bergen County, particularly a 1500 to 2000 foot stretch through Upper Saddle River. Plaintiffs are the owners of single family homes whose property is crossed by the utility's easement for the line. The easement is 50 feet wide. The line consists of three transmission wires and a ground shield wire hung on 70 foot wooden poles, beginning 37½ feet from the earth.

In February 1980, Rockland notified the plaintiffs that it was about to institute a "selective removal" program on its easement. Translated, this meant that the utility intended to clear the easement area of any trees that had the capacity to grow to the height of the wires.

Rockland had acquired its easement in 1927 when the land was undeveloped. In 1962 the utility clear cut along the ease-

ment to construct and erect the line. The land was thereafter subdivided and plaintiffs bought single family dwellings subject to the easement. When they bought their homes, the area was a woodland with trees, shrubbery and underbrush on the easement.

From time to time the utility trimmed and pruned the trees to keep them off the wires. The 1980 "selective removal" program was to be drastically different. Certain plaintiffs communicated with the Board of Public Utility Commissioners (Board) about the proposed program. On July 9, 1980, the Chief of the Board's Bureau of Engineering Operations wrote to one of the plaintiffs that the proposed program would benefit all of Rockland's customers by preserving the environmental quality of the rights-of-way, reducing the number of tree-related outages, and keeping maintenance costs down. The program did not violate Board regulations requiring non-uniform clearing and was "necessary to allow the Company to continue to provide safe, adequate and proper service."

On June 27, 1980, before receiving this reply from the Board, plaintiffs sought and obtained an order to show cause and temporary restraints against implementation of the selective removal program. On July 2, 1980, the Appellate Division denied Rockland's motion for leave to appeal and stay of the trial court's restraints. On July 23, 1980, those temporary restraints were continued to trial with provision for trimming any trees dangerously close to the utility's wires.

Following a personal view of the premises and a plenary trial, the trial court concluded that the terms of the easement did not allow for removal of any trees. It enjoined the utility from cutting, pruning, or trimming any trees or limbs on plaintiffs' property that were not within 15 feet of its wires. The Appellate Division affirmed the trial court's judgment on the basis of the oral opinion below. We granted the defendant's petition for certification. 93 *N.J.* 309 (1983).

The general principles of law involved are well settled:

> What the easement holder's rights are, *vis-a-vis* the landowner, depends first of all on the intent of the parties as expressed in the language of the grant, viewed in the light of the nature and reasonably necessary incidents of the permitted use . . . . Where the language of the instrument so viewed does not settle the matter completely—and it rarely does in a litigated situation, else there would be no law suit—the question becomes a mixed one of law and fact to be determined within the framework of the universally accepted principle of easement law that the landowner may not, without the consent of the easement holder, unreasonably interfere with the latter's rights or change the character of the easement so as to make the use thereof significantly more difficult or burdensome. *Johnston v. Hyde,* 33 *N.J.Eq.* 632, 648–649 (*E. & A.* 1881); *Manning v. Port Reading R.R. Co.,* 54 *N.J.Eq.* 46 (*Ch.* 1895); *Ingling v. Public Service Electric & Gas Co.,* 10 *N.J.Super.* 1 (*App.Div.*1950); 2 *Thompson, Real Property* § 427 (1961 repl.). Equally well recognized is the corollary principle that there is, arising out of every easement, an implied right to do what is reasonably necessary for its complete enjoyment, that right to be exercised, however, in such reasonable manner as to avoid unnecessary increases in the burden upon the landowner. *Lidgerwood Estates, Inc. v. Public Service Electric and Gas Co.,* 113 *N.J.Eq.* 403 (*Ch.* 1933).
>
> [*Tide-Water Pipe Co. v. Blair Holding Co., Inc.,* 42 *N.J.* 591, 604 (1964).]

We must first look to the grant itself. If its meaning were plain and unambiguous in the light of the circumstances surrounding its execution, we would look no further. *Hyland v. Fonda,* 44 *N.J.Super.* 180 (App.Div.1957). We cannot conclude that its language unambiguously settles the matter. The grant, dated October 6, 1927, conveyed to Rockland a

> right of way or easement [originally 100 feet in width] for the purpose of constructing, maintaining and operating thereon, electrical transmission lines with all necessary towers, conductors, guys and other fixtures and equipment, together with the right at all necessary times to enter upon said premises for the purpose of repairing, replacing, improving, enlarging and rebuilding, said system, and the purpose of patrolling the same, together with the right to cut and keep cut the trees, shrubbery and underbrush, as may be necessary for the proper operation and maintenance of said system over said entire right of way and to remove all buildings and obstructions from said right of way.

Each side points to conflicting provisions within the grant. Plaintiffs emphasize that the easement never speaks of the right to "cut down" or "remove" trees but only the right to "cut and keep cut" in the sense of trimming and pruning. Defendant emphasizes that "cut" means to "fell; hew," the latter signify-

ing the cutting down of a tree, citing Webster's Third New International Dictionary 560 (1976). The circumstances attendant to the easement's execution are not disclosed by the record. We do know that trees had to be cut down and removed in the 1960s when the original utility line was erected. We also know that the easterly 50 feet of the easement has been clear cut to allow the construction of an underground gas transmission line by another utility that acquired its rights by condemnation. Suffice it to say that we do not find that the easement's language "settle[s] the matter completely," *Tide-Water,* 42 *N.J.* at 604, as to the specific program of maintenance enjoined by the judgment below.

■ That being so, "the surrounding circumstances, including the physical conditions and character of the [property] and the requirements of the grantee, play a significant role" in determining the rights of the parties. *Hyland v. Fonda, supra,* 44 *N.J.Super.* at 187 (citing *Lidgerwood Estates, Inc. v. Public Service Elec. & Gas Co.,* 113 *N.J.Eq.* 403, 407 (Ch. 1933)).

The easement language defines the parties' rights in terms of what is "necessary for the proper operation and maintenance of said system." In some sense this concept mirrors the statutory charge of the Board of Public Utility Commissioners. The Board is to see that each utility furnishes "safe, adequate and proper service" and that each utility "maintain[s] its property and equipment in such condition as to enable it to do so." *N.J.S.A.* 48:2–23.

■ A court defining the rights of the parties under this easement would have to determine what is "necessary for the proper operation and maintenance" of the system. Since the Board is charged with the obligation to decide that precise question, and since no other surrounding circumstances were demonstrated to call for another meaning, the court should have referred such disputed factual issues to the Board for resolution:

This is a corollary application of the broader principle that where a court has concurrent, discretionary jurisdiction with another court or an administrative agency, the decision to exercise jurisdiction *vel non* should be fully responsive to the competence, expertise and status of the other tribunal. *Nader v. Allegheny Airlines, Inc.,* 426 *U.S.* 290, 96 *S.Ct.* 1978, 48 *L.Ed.2d* 643 (1976); See Field, "The Abstention Doctrine Today", 125 *U.Pa.L.Rev.* 590 (1977). Comity and deference to cognate tribunals are designed to assure that a controversy, or its most critical facets, will be resolved by the forum or body which, on a comparative scale, is in the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter.

[*Hinfey v. Matawan Regional Bd. of Educ.,* 77 *N.J.* 514, 531–32 (1978).]

The doctrinally-related principles of exhaustion of administrative remedies and primary jurisdiction both serve the larger policy of implementing this organic theory of governmental structure:

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

[*United States v. Western Pac. R. Co.,* 352 *U.S.* 59, 63–64, 77 *S.Ct.* 161, 164–65, 1 *L.Ed.2d* 126, 132 (1956), *cited in Woodside Homes, Inc. v. Morristown,* 26 *N.J.* 529, 541 (1958).]

Focusing upon the appeal at hand, these principles should have been invoked at the earliest stages of the dispute. We do not imply that the agency may enlarge or contract the legal rights of the parties. When the legal rights of parties are clear, it is unjust and unfair to burden them with an administrative proceeding to vindicate their rights. *New Jersey Civil Service Ass'n v. State,* 88 *N.J.* 605, 613 (1982); *cf. Farmingdale Realty Co. v. Borough of Farmingdale,* 55 *N.J.* 103, 112–13 (1969) (taxpayer whose building had been taxed twice could recover refund without exhausting administrative remedies); *Nolan v. Fitzpatrick,* 9 *N.J.* 477 (1952) (exhaustion of administrative remedies not required when sole issue is county's legal

duty to appropriate funds for commission). But when the determination of the legal issue must be preceded by "the taking of the necessary evidence and the making of the necessary factual findings," it is best done by the administrative agency specifically equipped to inquire into the facts. *Roadway Express, Inc. v. Kingsley,* 37 *N.J.* 136, 140 (1962).

There is an unavoidable relationship between the feasibility of a utility's right-of-way maintenance program and its reasonableness in light of the utility's statutory obligation to render safe, adequate and proper service. *N.J.S.A.* 48:2–23. For while it may be technically feasible to hand prune the limbs of larger growing trees, reasonable systemwide maintenance may call for the use of mechanical equipment not suitable to the terrain of upper Bergen County. In such circumstances, other reasonable alternatives should be considered.

We recognize that in determining what was necessary for the safe and efficient operation of the system the trial court carefully considered the physical terrain even to the extent of walking the easement. In addition, that court considered the application of the Board's regulations affecting right-of-way maintenance, *N.J.A.C.* 14:5–6.1, as well as the parent utility's Vegetation Right-of-Way Management Program. Yet we believe that the necessary factual findings are best made initially by the agency.

The Board must see that safe, adequate, proper and environmentally sound service is rendered by a utility at rates that are reasonable. *N.J.S.A.* 48:2–23. The Board cannot benefit the utility's customers or its stockholders at the expense of property owners by enlarging the contract rights of the utility. In essence, this would be a taking of an owner's property that can be accomplished only by exercise of statutory grants of eminent domain. *N.J.S.A.* 48:3–17.6; 20:3–1 to –50.

In the context of this case the proceeding before the Board contemplates the hearing procedures of a contested case. *N.J. A.C.* 14:1–1.1 to –17.9. We anticipate that the Board will carefully and promptly evaluate the competing claims of the

parties in light of its statutory duties and its own administrative program for right-of-way maintenance, taking into account proposed methods of restoration as well as the Rockland parent's avowed policy of cooperation with local shade tree commissioners as expressed in Orange and Rockland's 1978 Right-of-Way Management Program. The Board shall submit to the trial court its findings and recommendations as to what is reasonably necessary for the proper maintenance of the utility system.

■ We stress that by retaining this role for the court, we are not giving the green light to those who seek to bypass the primary jurisdiction of the agency. Rather, we recognize the Board's expertise with these factual issues. Courts should be sensitive to purported legal claims that are really regulatory issues and should be referred to the agency. The legal dispute here was genuine. We hold only that where the resolution of a contested legal issue properly brought before a court necessarily turns on factual issues within the special province of an administrative agency, the court should refer the factual issues to that agency. The trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved and enter its final judgment resolving the mixed questions of law and fact based upon the agency fact finding.

■ In this case we have determined as a matter of law that selective removal of certain trees is within the contemplation of the easement language. In another case a court may find notwithstanding the agency's expertise that implementing the agency's findings would be an unauthorized increase in the burden upon the landowner, violating the party's legal rights. In such case, review in the Appellate Division would encompass both the agency fact finding and the correctness of the legal conclusions drawn therefrom in a single appeal. R. 2:2–3.

The judgment below is reversed and remanded to the trial court for reference of the factual issues to the Board of Public Utility Commissioners. We leave undisturbed the trial court's

preliminary injunction pending final disposition. Costs to abide the event.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.